**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

---

|  |  |  |
|---|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** | : | |
| | : | |
| | : | **Civil Action No.  17-cv-4883** |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **Jury Trial Demanded** |
| | : | |
| **QUADRANT 4 SYSTEM CORPORATION, NANDU THONDAVADI, and DHRU DESAI,** | : | |
| | : | |
| **Defendants.** | : | |

---

## COMPLAINT

Plaintiff Securities and Exchange Commission (the "Commission" or "SEC") alleges the following against defendants Quadrant 4 System Corporation ("QFOR"), Nandu Thondavadi ("Thondavadi"), and Dhru Desai ("Desai"):

## NATURE OF THE ACTION

1.      From at least June 2012 through November 2016, Thondavadi and Desai, then senior executives of QFOR, a public company headquartered in Schaumburg, Illinois, engaged in a fraudulent financial reporting scheme in order to conceal their misappropriation of over $4.1 million, conceal significant QFOR liabilities, inflate revenue, overstate assets, and otherwise maintain the appearance that QFOR was a growing information technology firm worthy of external financing.  As a result of this scheme, Thondavadi and Desai, and, through them, QFOR, committed numerous violations of the securities laws.

2.      QFOR, Thondavadi, and Desai deliberately misreported QFOR's financial performance by, among other things, repeatedly making false accounting entries in QFOR's books, creating phony supporting documentation as back-up for such false entries, and providing fraudulent documents to QFOR's outside auditors in connection with their reviews and audits of QFOR's financial statements.

3.      One of Thondavadi's and Desai's principal objectives in carrying out their fraudulent scheme was to hide their misuse of corporate assets from investors and other stakeholders.  From 2010 through 2016, QFOR repeatedly stated in public filings that management received no cash compensation and the only authorized compensation had been the issuance of certain warrants.  Thondavadi, as Chief Executive Officer ("CEO"), and Desai, as Chief Financial Officer ("CFO"), signed each of these filings.  Thondavadi and Desai, however, regularly diverted cash and stock from the company for their personal benefit, including payment of debts owed to past business associates and significant judgment creditors.  These fraudulent disbursements were typically routed through undisclosed related parties – shell companies controlled by Thondavadi and/or Desai with little or no operations – to give the false appearance that QFOR had paid vendor invoices or other legitimate expenses when, in truth, the funds had been transferred to or for the benefit of Thondavadi and Desai.

4.      Thondavadi and Desai not only concealed their embezzlement, but also concealed a number of other liabilities of QFOR.  For example, at their direction, over $1.5 million in unpaid tax liabilities and $1.25 million in liabilities resulting from a lawsuit settlement were excluded from QFOR's financial statements.  Thondavadi and Desai also concealed $1.9 million in QFOR liabilities owed to investors who had made private investments with the company.  The concealment of these liabilities caused QFOR's total liabilities, current liabilities, and/or long-

term debt to be materially understated in QFOR's public filings for each period from the first
quarter of 2013 through the second quarter of 2016.

5.      To carry out their scheme, Thondavadi and Desai repeatedly used QFOR
acquisitions to mask their misappropriation of QFOR money for improper and/or undisclosed
purposes.  By misstating the terms of various acquisitions between 2013 and 2015, they created
fictitious financial obligations to conceal their near-continuous diversion of funds.  In this time
frame, the terms described in QFOR's public filings differed from the terms set forth in the
actual deal documents with respect to five QFOR acquisitions.  Thondavadi and Desai caused
QFOR to misstate the amounts of cash and stock paid, the amounts of contingent earn-out
payments, and the nature and size of liabilities assumed in connection with the acquisitions.  To
evade scrutiny, Thondavadi and Desai provided doctored and forged versions of the documents
to QFOR's auditors and transfer agent.  As a result of their misstatements regarding the terms of
three acquisitions that took place in 2014 and 2015, Thondavadi and Desai knowingly caused
QFOR to materially overstate its total assets by approximately $2.7 million as of year-end 2014
and $4.3 million as of year-end 2015.

6.      Another objective of the scheme was to ensure that QFOR's reported performance
conformed to a narrative of growth towards profitability, so QFOR could secure outside
financing to fund its operations.  Thus, in addition to causing QFOR to understate its liabilities
and overstate its acquired assets, Thondavadi and Desai knowingly caused QFOR to report
revenue that was inflated by almost $4.3 million – a nearly 10% overstatement – in 2014.

7.      From at least 2013 to June 2015, Thondavadi and Desai directed QFOR's
accounting staff to record fictitious revenue and receivables into QFOR's books and records.
Until approximately March 2015, a number of fake invoices were attributed to existing QFOR

3

customers.  After QFOR's auditors discovered that certain accounts receivable confirmations received in the course of their annual audit work were false, and thus resigned in April 2015, the inflation of revenue continued by slightly different means.  Around this time, Thondavadi and Desai directed QFOR employees to reclassify $2.7 million in fake invoices previously attributed to twelve real customers and record those fake invoices as attributable to a single customer, Cynosure Corporation ("Cynosure").  Cynosure had no real business, but was newly created on paper by Thondavadi to further the scheme.  QFOR continued to record fictitious revenue from Cynosure through at least June 2015.

8.      To lend credibility to this false business activity, the fake invoices recorded in QFOR's accounting records were primarily paid, at Thondavadi's direction and with Desai's knowledge, through a series of "round-trip" transactions.  The essence of these transactions was a circular flow of money for no business purpose, through bank accounts under the defendants' control, by which QFOR improperly recognized its own cash as payments on its accounts receivable.

9.      Thondavadi's and Desai's fraudulent conduct resulted in the material falsification of QFOR's financial condition as reported in QFOR's public filings.  QFOR's periodic and other reports filed with the Commission mispresented and omitted to state material facts concerning QFOR's revenue, acquisitions, assets, liabilities, and related party transactions, as well as cash disbursements to or for management and management's stock holdings.  Thondavadi and Desai prepared, approved, and signed false certifications verifying the accuracy of QFOR's periodic reports on Forms 10-Q and Forms 10-K containing the misstated financial information.

10.      These fraudulent filings, which gave investors and potential investors an inaccurate picture of the company's financial condition and omitted important information

4

concerning management's deceptive behavior, were available at times when QFOR made private offerings of its securities. From 2013 to 2016, QFOR made at least five private offerings to institutional and/or individual investors. In several instances, Thondavadi and Desai explicitly referred the investors to QFOR's public filings and vouched for their accuracy.

11. Through the activities alleged in this Complaint, defendants QFOR, Thondavadi, and Desai violated the antifraud provisions set forth in Section 17(a) of the Securities Act of 1933 (the "Securities Act") [15 U.S.C. § 77q(a)] and Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. §§ 240.10b-5]. In addition, QFOR violated recordkeeping, internal control, and reporting requirements under Sections 13(b)(2)(A), 13(b)(2)(B), and 15(d) of the Exchange Act [15 U.S.C. §§ 78m(b)(2)(A), 78m(b)(2)(B), 78o(d)] and Rules 12b-20, 15d-1, 15d-11, and 15d-13 thereunder [17 C.F.R. §§ 240.12b-20, 240.15d-1, 240.15d-11, 240.15d-13], and Thondavadi and Desai controlled QFOR at the time of, and aided and abetted, those violations.

12. By falsifying QFOR's books and records, making misrepresentations to QFOR's auditors, and signing false certifications included in QFOR's public filings, Thondavadi and Desai also violated Section 13(b)(5) of the Exchange Act [15 U.S.C. § 78m(b)(5)] and Rules 13b2-1, 13b2-2, and 15d-14 thereunder [17 C.F.R. §§ 240.13b2-1, 240.13b2-2, 240.15d-14].

13. Accordingly, the Commission seeks a judgment from the Court: (a) finding that defendants committed the violations alleged herein; (b) permanently enjoining defendants from violating or aiding and abetting future violations of these provisions of the federal securities laws; (c) barring Thondavadi and Desai from acting as officers and directors of a public company pursuant to Section 20(e) of the Securities Act [15 U.S.C. § 77t(e)] and Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)]; (d) requiring defendants to disgorge, with

prejudgment interest, ill-gotten gains; and (e) requiring defendants to pay civil money penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)].

## JURISDICTION AND VENUE

14.     The Commission brings this action pursuant to enforcement authority conferred by Section 20(b) of the Securities Act [15 U.S.C. § 77t(b)] and Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)].

15.     This Court has jurisdiction over this action pursuant to Sections 20(b), 20(d), and 22(a) of the Securities Act [15 U.S.C. §§ 77t(b), 77t(d), 77v(a)] and Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), 77aa].

16.     In connection with the conduct alleged in this Complaint, defendants have directly or indirectly made use of the means or instrumentalities of transportation or communication in interstate commerce, the facilities of a national securities exchange, or the mails.

17.     Venue is proper in this district under 28 U.S.C. § 1391(b), Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)], and Section 27 of the Exchange Act [15 U.S.C. § 77aa] because the events or omissions giving rise to the claims, specifically, the acts, practices, transactions, and courses of business constituting the alleged securities law violations, occurred in substantial part within this district and because, as set forth below, defendants QFOR, Thondavadi, and Desai reside in this district.

## DEFENDANTS

18.     Quadrant 4 System Corporation is an Illinois corporation with its principal place of business in Schaumburg, Illinois.  At times between 2012 and 2016, Quadrant 4 System Corporation operated through various subsidiaries.  Quadrant 4 System Corporation and its

subsidiaries are collectively referred to in this Complaint as "QFOR." At all relevant times, QFOR's common stock was traded in the over-the-counter (OTC) market and, specifically, was quoted on OTC Link (formerly "Pink Sheets"), operated by OTC Markets Group, Inc., under the symbol "QFOR." Although QFOR does not have any class of securities registered with the Commission, it was at all relevant times a public reporting company pursuant to Section 15(d) of the Exchange Act. QFOR has over 100 employees and provides software products, platforms, and consulting services to customers in various industries. QFOR operated under the name Zolon Corporation from March 4, 2010 to March 31, 2011.

19. Nandu Thondavadi, age 63, is a resident of North Barrington, Illinois. From approximately June 2010 until December 5, 2016, Thondavadi was Chief Executive Officer of QFOR and served on the company's Board of Directors. From at least 2013 to 2016, Thondavadi certified QFOR's annual reports on Form 10-K and quarterly reports on Form 10-Q filed with the Commission. As of year-end 2015, Thondavadi and his immediate family members, directly and indirectly, owned at least 7.8% of QFOR's common stock. As described further below, he and Desai also exercised effective control over additional blocks of QFOR common stock.

20. Dhru Desai, age 55, is a resident of Barrington, Illinois. From approximately May 2010 until December 5, 2016, Desai was the Chairman of the Board of Directors of QFOR. From approximately June 2010 until December 5, 2016, Desai was also the Chief Financial Officer of QFOR. From at least 2013 to 2016, Desai certified QFOR's annual reports on Form 10-K and quarterly reports on Form 10-Q filed with the Commission. As of year-end 2015, Desai and his immediate family members, directly and indirectly, owned approximately 9.35%

of QFOR's common stock.  As described further below, he and Thondavadi also exercised

effective control over additional blocks of QFOR common stock.

21.     Thondavadi and Desai each resigned from all officer and employee positions of

QFOR on December 5, 2016, after being arrested and charged in a related criminal case pending

in this district (Case No. 16 CR 772).

## RELATED ENTITIES AND PERSONS

22.     Global Technology Ventures Corporation ("Global Technology") is an inactive

corporation controlled by Thondavadi.  Global Technology was incorporated in Illinois in 2006

and involuntarily dissolved in 2007.  Thondavadi opened a bank account in the name of Global

Technology in January 2007, which he controlled and used to pay his personal expenses from at

least 2012 through 2016.

23.     Desai controls two entities with similar names:  Congruent Ventures Ltd. and

Congruent Ventures LLC (collectively, "Congruent").  Congruent Ventures Ltd. is an inactive

corporation incorporated in Illinois in 2012 and involuntarily dissolved in 2014.  Congruent

Ventures LLC is an Illinois limited liability company formed in 2003 and managed by Desai and

his spouse.  Desai has had signatory authority over bank and brokerage accounts in the name of

Congruent Ventures LLC since at least 2004.  Desai used the Congruent Ventures LLC bank

account to pay his personal expenses from at least 2012 through 2016.

24.     CS Acquisition Corporation ("CS Acquisition") is a New Jersey corporation

incorporated in 2010.  Thondavadi controlled CS Acquisition and several bank accounts in the

name of that entity between at least 2012 and 2016.

25.     Cynosure Corporation ("Cynosure") is an inactive corporation controlled by

Thondavadi.  Cynosure was incorporated in Illinois in 2015 and dissolved in 2016.  Thondavadi

controlled a bank account in the name of Cynosure between at least April 2015 and November 2016.

26. Core Information Technology Solutions, Inc. ("CITS") was incorporated in Illinois in 2014 and involuntarily dissolved in 2015. Thondavadi controlled CITS and bank accounts in its name between at least May 2014 and November 2016. CITS was one of QFOR's largest customers in 2014 and 2015.

27. Surrex Solutions Corp. ("Surrex") was a California corporation headquartered in El Segundo, California. Thondavadi controlled Surrex and bank accounts in its name between at least September 2014 and November 2016. Surrex was another of QFOR's largest customers in 2014 and 2015.

28. Thondavadi and Desai controlled an entity or entities referred to as Stonegate Holdings, Inc. ("Stonegate"), along with associated bank and brokerage accounts, between at least 2009 and 2016. Stonegate, along with its affiliate Stonegate Assets, Inc., is a significant shareholder of QFOR. As of year-end 2015, these two entities together owned at least 12.58% of QFOR's common stock. Until at least May 2016, Stonegate owned a key supplier and contractor of QFOR located in India, Quadrant 4 Software Solutions (Pvt.) Limited ("Q4 India").

29. Associate A was a business associate of Thondavadi and Desai before their involvement with QFOR. Associate A never played any role at QFOR, but he was a codefendant of Thondavadi and Desai in numerous lawsuits related to their pre-QFOR business activities.

## STATEMENT OF FACTS

### A. QFOR's Business and Management

30. Between 2010 and December 2016, Thondavadi and Desai controlled QFOR's management, direction, and day-to-day operations, including QFOR's bank accounts. They prepared, approved, and certified QFOR's financial statements and other public filings. They

also signed management representation letters containing representations regarding, among other things, the proper recording of material transactions (such as acquisitions), related party transactions, and outstanding liabilities, which were sent to QFOR's auditors in connection with each annual audit and quarterly review for the periods between at least year-end 2012 and the third quarter of 2016.

31.     In connection with their roles at QFOR, Thondavadi and Desai portrayed themselves as successful businessmen in the information technology (IT) sector.

32.     According to QFOR's annual reports on Form 10-K filed with the Commission, Thondavadi was the founder of a consulting firm that provided "merger and acquisition advisory services to companies in the information technology sectors" and previously had been the CEO "of a global software company for over a decade." The biographical description included for Desai in such reports stated that he had "successfully built both private and public companies in the IT and Telecommunications field over the past 25 years."

33.     When Thondavadi and Desai joined QFOR in 2010, it was operating under the name of Zolon Corporation as a publicly held company with limited operations. After Thondavadi and Desai became the CEO and CFO, respectively, the company began operating under its current business model.

34.     QFOR's primary business lines are (1) "Services," consisting of IT consulting, software development, and managed services, and (2) "Platforms," consisting of the provision of software products and platforms on a subscription basis.

35.     Since 2010, the majority of QFOR's reported revenue has been generated by the Services line and is billed on a time and material basis.

36.     QFOR's stated business strategy included expansion in IT-related market segments through strategic business combinations.  Since 2010, QFOR has completed a number of acquisitions, in which it generally acquired businesses, technology assets, and customer lists in exchange for cash payments and QFOR common stock.

37.     Between 2010 and December 2016, QFOR consistently reported an annual net loss and its common stock consistently traded for less than a dollar per share, outside of the major market exchanges.

38.     During the 2013 to 2015 timeframe, Thondavadi and Desai stated to various QFOR investors, as well as to the company's auditors, that their goal was to grow QFOR such that its common stock would qualify in the near future for listing on the NASDAQ.  To qualify for listing on the NASDAQ, a company must meet certain financial, liquidity, and corporate governance requirements, including minimum bid price requirements for initial listing ($4 per share) and continued listing ($1 per share) on the exchange.  As substantial QFOR shareholders, Thondavadi and Desai stood to benefit from the enhanced share value and liquidity resulting from the company's qualification for inclusion on the NASDAQ.

39.     During the 2013 to 2016 timeframe, QFOR engaged three successive independent auditors.  Auditor A served as QFOR's auditors from June 2012 until their resignation in April 2015.  Auditor A audited QFOR's year-end financial statements for 2012 and 2013 and reviewed QFOR's quarterly financial statements for each quarter of 2013 and 2014.  Auditor B served as QFOR's auditors from April 2015 until their resignation in October 2016.  Auditor B audited QFOR's year-end financial statements for 2013, 2014, and 2015 and reviewed QFOR's quarterly financial statements for each quarter of 2015 and the first two quarters of 2016.  QFOR engaged a third audit firm after Auditor B's resignation.

11

**B.    QFOR's Public Filings Consistently Stated Thondavadi and Desai Received No Salary, but Failed to Disclose Their Misappropriation of QFOR Funds**

40.    At various times, Thondavadi and Desai told investors that they would not be taking salaries from QFOR for the foreseeable future.  In its Forms 10-K for the years 2010 through 2015, QFOR stated that Thondavadi and Desai received no cash compensation, and the only management compensation authorized by the Board of Directors in that time frame was the issuance of certain warrants in 2013 and 2015.  Investors found these representations attractive – a sign that Thondavadi and Desai were invested in the company for the long term.

41.    The notion that Thondavadi and Desai were accomplished executives who could comfortably forgo salaries until they guided QFOR to success was false.  To the contrary, Thondavadi and Desai each had substantial outstanding debts related to past business ventures when they joined QFOR, and they continued thereafter to incur substantial personal liabilities. For example, in the span of just three months in 2011, Thondavadi and Desai were sued three times resulting in judgments and/or settlements totaling over $2.5 million.

42.    As detailed below, Thondavadi and Desai later caused QFOR to make payments to personal creditors and conceal the payments as legitimate QFOR expenses.  Thondavadi and Desai also made numerous misrepresentations to QFOR's auditors and to its transfer agent (a third party used by QFOR to keep track of the individuals and entities that own its securities) to conceal these payments.

**C.    From 2012 to 2016, Thondavadi and Desai Pilfered Millions from QFOR.**

43.    Not long into their tenures at QFOR, Thondavadi and Desai began siphoning cash and stock from QFOR for their own personal benefit, including for payment of their mounting personal debts.

           **i.**       **Thondavadi and Desai misused QFOR funds to satisfy personal liabilities.**

44.     **The MITL Loan.**  Thondavadi owed over $1 million to an individual ("Creditor A") stemming from transactions in 2002.  In that year, Creditor A loaned over $1 million to Mascon Information Technologies Limited ("MITL"), a division of Mascon Global Limited ("MGL"), when Thondavadi was the managing partner of MGL.  After MGL went out of business without repaying the loan (the "MITL Loan"), Thondavadi personally undertook to repay it.  Thondavadi misappropriated $705,000 from QFOR towards repaying the MITL Loan.

45.     In a February 24, 2012 email to Creditor A, Thondavadi stated that if he could not repay the MITL Loan via other means, he would "simply start diverting operational funds" to Creditor A "on a monthly basis."  Thondavadi proceeded to do precisely that.

46.     From at least November 2012 and continuing through June 2016, Thondavadi diverted funds from QFOR bank accounts to make $15,000 monthly payments towards satisfaction of the MITL Loan.  These payments were falsely recorded in QFOR's accounting records, sometimes as payments to Creditor A for consulting services, and at other times as payments to other third parties for liabilities relating to acquisitions.  QFOR accounting staff made these false entries in the company's accounting records at Thondavadi's direction.

47.     **The Martek Loan**.  In 1999, an individual ("Creditor B") loaned $400,000 to Martek Holdings, Inc., another company with which Thondavadi was associated.  Thondavadi executed a personal guarantee of this loan ("the Martek Loan").  After Martek Holdings went out of business, Creditor B sought to enforce Thondavadi's personal guarantee of the Martek Loan against him.

48.     In late 2015, Thondavadi settled Creditor B's claims against him for the Martek Loan in exchange for 300,000 shares of QFOR stock valued at $57,000.  In the settlement

13

agreement, Thondavadi claimed that this stock belonged to him personally. In reality, Thondavadi and Desai caused QFOR's transfer agent to issue the 300,000 shares of QFOR stock to Creditor B by falsely claiming that Creditor B was a QFOR employee who was receiving a performance bonus. Thondavadi and Desai caused accounting records sent to QFOR's auditors to include this same false explanation for the shares issued to Creditor B.

49. **The Creditor C Settlement.** In February 2010, Thondavadi, Desai, and Associate A executed a $200,000 note in favor of a financial institution ("Creditor C") in connection with the acquisition of certain assets. They defaulted on the note payments, and in May 2011, Creditor C filed a lawsuit against them in United States District Court. QFOR was not a party to the lawsuit. In a settlement agreement reached in March 2012 (the "Creditor C Settlement"), Thondavadi, Desai, and Associate A agreed to pay Creditor C $250,000 plus interest and attorney's fees pursuant to a payment plan.

50. Thondavadi and Desai misappropriated $150,000 from QFOR to satisfy their joint obligations under the Creditor C Settlement. Starting in at least January 2013 and continuing through February 2014, the two executives caused periodic payments of $15,000 to be made to Creditor C with QFOR funds, primarily by concealing the payments by routing them through another bank account they controlled, in the name of Stonegate. Thondavadi directed QFOR accounting staff to falsely record the underlying payments from QFOR as payments on a loan to a different entity.

51. **The Creditor D Settlement.** In December 2010, Thondavadi, Desai, and Associate A personally guaranteed promissory notes executed by Stonegate in favor of an individual and a family trust (together, "Creditor D"). The promissory notes were issued to repay funds that Creditor D had invested with Thondavadi and Desai in 2009. In May 2011,

14

after Stonegate had defaulted on the note payments, Creditor D filed a lawsuit in state court against Stonegate, Thondavadi, Desai, and Associate A. QFOR and two of its other directors were later added as defendants. Pursuant to a settlement agreement reached in August 2012 (the "Creditor D Settlement"), the court entered an agreed final judgment in the amount of $500,000 against Stonegate, Thondavadi, and Desai. Under the terms of the settlement, Stonegate, Thondavadi, and Desai were to pay the $500,000 over time and deliver 150,000 shares of QFOR common stock to Creditor D.

52.     Between January 2013 and January 2014, Thondavadi and Desai diverted $420,000 from QFOR accounts to pay their personal obligations under the Creditor D Settlement. Of this amount, $280,000 was paid directly from a QFOR bank account and falsely recorded in QFOR's accounting records, at Thondavadi's direction, as an earn-out payment related to an acquisition. The remaining Creditor D Settlement payments were routed through a Stonegate bank account controlled by Thondavadi and Desai. At Thondavadi's direction, the underlying payments from QFOR to Stonegate were falsely recorded in QFOR's accounting records as payments on a loan from a different entity to QFOR.

53.     The terms of the Creditor D Settlement also called for the issuance of QFOR stock. In August 2013, Thondavadi and Desai caused QFOR to issue common stock to Creditor D valued at $10,800. The stock issuance was falsely recorded in QFOR's accounting records as compensation for consulting performed by Creditor D. Thondavadi and/or Desai manufactured supporting documentation for the false entry in the form of a consulting agreement between QFOR and Creditor D. On or about August 16, 2013, Desai emailed a copy of the phony agreement to QFOR's transfer agent to support the issuance of the shares.

15

54.     Subsequently, on or about November 7, 2013, Thondavadi emailed a different version of the phony consulting agreement to Auditor A in response to an inquiry they made as part of their review of the financial information to be included in QFOR's quarterly report on Form 10-Q for the period ending September 30, 2013.

55.     **The Creditor E Judgment**.  In September 2011, a $152,000 judgment was entered against Desai in favor of his former attorneys ("Creditor E").  In connection with Creditor E's representation of Desai in a 2006 lawsuit seeking to collect on a promissory note personally guaranteed by Desai, Desai had accumulated over $150,000 in legal fees owed to Creditor E but failed to make any payments.  Creditor E pursued its claims against Desai, resulting in the 2011 judgment (the "Creditor E Judgment").  From January 2013 to March 2015, Desai caused QFOR to pay $62,500 to Creditor E in partial satisfaction of this personal liability.

56.     **Personal Credit Cards.**  From 2012 to 2016, Thondavadi and Desai also caused QFOR to pay many of their other individual obligations, including at least $158,565 of Thondavadi's personal credit card debt and at least $49,394 of Desai's personal credit card debt.

        **ii.**      **Thondavadi and Desai misappropriated QFOR cash and stock by directing bank transfers and stock issuances to entities they controlled.**

57.     From 2012 to 2016, Thondavadi and Desai misappropriated an additional $1.5 million from QFOR by funneling funds and/or stock through Global Technology and Congruent.

58.     Between June 2012 and October 2015, QFOR transferred net amounts of approximately $674,000 directly to the Global Technology bank account and $460,000 directly to the Congruent bank account.  Thondavadi and Desai used these funds for a variety of personal expenses and also distributed a significant portion of the funds to accounts held beneficially for family members.  At Thondavadi's direction, QFOR accounting staff routinely made false entries in QFOR's accounting records by recording the transfers to Global Technology and Congruent

16

as payments on an unrelated note, acquisition-related payments to other third parties, and payments to vendors.

59.     Additionally, in September 2013, QFOR issued 993,287 shares of stock, with a recorded value of $327,785, to Global Technology in satisfaction of QFOR's purported obligations to Global Technology under a February 2013 promissory note.  But this was yet another illegitimate transaction, as the funds loaned from Global Technology to QFOR pursuant to the promissory note originated from QFOR's own accounts.  Essentially, Thondavadi loaned QFOR its own money and then later used this as a false pretense to secretly increase his holdings of QFOR stock.

> ### iii.     Thondavadi and Desai misappropriated the proceeds of QFOR stock sales.

60.     **The $1 Million QFOR Stock Sale.**  On top of the payment of personal debts and the transfer of cash and stock to personal entities set forth above, Thondavadi and Desai misappropriated another $1 million from the proceeds of the sale of QFOR stock issued for a purported transaction with a private entity named Technology Acquisitions, Inc. ("TAI").

61.     In May 2014, QFOR purchased certain technology assets from TAI in exchange for approximately 4.4 million shares of QFOR common stock valued at $2 million.  Desai provided an asset purchase agreement, incorporating these terms and signed by Thondavadi, to QFOR's transfer agent in June 2014 to support the issuance of the stock.  Although the shares were then issued in the name of TAI, QFOR's transfer agent mailed the stock certificates to QFOR's offices, per Desai's instruction.  In the following months, Thondavadi and Desai diverted the approximately 4.4 million shares of stock, ostensibly issued to TAI, for their personal use and for other QFOR corporate purposes.

62.     In September 2014, Desai and Thondavadi resold 2.32 million of these shares to three individual investors for $1.32 million.  Desai directed the investors to wire the funds to a bank account in the name of CS Acquisition, one of the many accounts controlled by Thondavadi and Desai.  From the $1.32 million stock sale proceeds, $500,000 each was disbursed to Thondavadi and Desai via transfers to entities controlled by them and/or their wives.  The balance was transferred to QFOR's bank accounts and falsely recorded in QFOR's accounting records as payments on false invoices.

63.     **The Contractor A Stock Sale.**  Finally, in December 2013, Thondavadi and Desai misappropriated $53,200 from a sale of QFOR stock to a QFOR contractor ("Contractor A").  Desai suggested that Contractor A purchase some stock from the company, and Contractor A agreed.  Desai provided routing and account numbers to Contractor A for the transfer of funds, and Contractor A wired $53,200 to that bank account.  Contractor A believed that bank account to be a QFOR bank account, but instead it was the Congruent bank account, controlled by Desai.  Out of the $53,200, Desai wrote a check for $25,000 to Global Technology, which Thondavadi deposited into the Global Technology account, and a check for $25,000 to Desai's wife.

64.     Desai then falsely told QFOR's transfer agent that the stock to be issued to Contractor A was being granted as a "yearly performance bonus."  Additionally, to conceal his diversion of the proceeds of the stock sale, Desai caused documents provided to QFOR's auditors to falsely state that the stock was issued as an advance on consulting work to be performed in 2014.

65.     As a result of the misappropriation described above, representations made in the following public filings that Thondavadi and Desai received no cash compensation were materially false and misleading:  QFOR's Forms 10-K for year-end 2012 through 2015 (filed on

March 29, 2013; March 17, 2014; August 21, 2015; and March 28, 2016, respectively) and Form 10-K/A for year-end 2015 (filed on September 23, 2016).

66.     Numerous QFOR Forms 10-Q were also materially false and misleading because the financial statements in those filings did not disclose that most of the misappropriated funds were falsely recorded in QFOR's accounting records as payments towards legitimate QFOR expenses, payments on QFOR liabilities, or other items.  This was the case for QFOR's Forms 10-Q for at least the first quarter of 2013 through the third quarter of 2016 (filed on May 15, 2013; August 13, 2013; November 13, 2013; May 14, 2014; August 13, 2014; November 12, 2014; September 9, 2015; September 18, 2015; November 4, 2015; May 16, 2016; August 15, 2016; and November 14, 2016, respectively).

67.     In total, Thondavadi and Desai misappropriated more than $4.1 million from QFOR between 2012 and November 2016.  The following table summarizes the categories and corresponding amounts, by year, of this misappropriation:

| | 2012 | 2013 | 2014 | 2015 | 2016 | TOTALS |
|---|---|---|---|---|---|---|
| MITL Loan / Creditor A | $ 90,000 | $ 180,000 | $ 180,000 | $ 180,000 | $ 75,000 | $ 705,000 |
| Martek Loan / Creditor B | $ - | $ - | $ - | $ 57,000 | $ - | $ 57,000 |
| Creditor C | $ - | $ 135,000 | $ 15,000 | $ - | $ - | $ 150,000 |
| Creditor D (Cash and Stock) | $ - | $ 150,800 | $ 280,000 | $ - | $ - | $ 430,800 |
| Creditor E | $ - | $ 32,500 | $ 20,000 | $ 10,000 | $ - | $ 62,500 |
| Thondavadi credit cards | $ - | $ 10,073 | $ 9,080 | $ 3,187 | $ 136,225 | $ 158,565 |
| Desai credit cards | $ - | $ 5,331 | $ 40,692 | $ 3,370 | $ - | $ 49,393 |
| Global Technology (Cash) | $ - | $ 123,139 | $ 250,000 | $ 300,994 | $ - | $ 674,133 |
| Global Technology (Stock) | $ - | $ 327,785 | $ - | $ - | $ - | $ 327,785 |
| Congruent | $ 70,000 | $ 160,000 | $ 170,000 | $ 60,000 | $ - | $ 460,000 |
| TAI Stock Sale | $ - | $ - | $ 1,000,000 | $ - | $ - | $ 1,000,000 |
| Contractor A Stock Sale | $ - | $ 53,200 | $ - | $ - | $ - | $ 53,200 |
| **TOTALS** | **$ 160,000** | **$ 1,177,828** | **$ 1,964,772** | **$ 614,551** | **$ 211,225** | **$ 4,128,376** |

**D.      From 2013 to 2016, QFOR Materially Understated Its Liabilities Due to the Fraudulent Conduct of Thondavadi and Desai.**

68.      In addition to concealing the many fraudulent disbursements QFOR made for their personal benefit, Thondavadi and Desai concealed several actual QFOR liabilities from QFOR's investors and auditors, including as much as $1.5 million in tax liabilities, a $1.25 million year-end liability under a legal settlement, and $1.9 million in liabilities to two investor groups.

**i.      Thondavadi knowingly caused QFOR to conceal certain tax liabilities.**

69.      Beginning at least in 2011, QFOR incurred or assumed various tax liabilities to the Internal Revenue Service ("IRS") and state taxing authorities.  QFOR did not disclose some of these tax liabilities in its periodic filings.

70.      In connection with Auditor A's review of QFOR's financial statements for the first quarter of 2013, Thondavadi falsely told Auditor A that tax liabilities totaling more than $480,000 had been paid in full by the end of March 2013.  To support this misrepresentation, Thondavadi caused QFOR staff to provide Auditor A with forged copies of checks made payable to the IRS and purportedly cashed by the United States Treasury.  In reality, instead of sending funds to the IRS, QFOR sent three checks totaling over $480,000 to a bank account in the name of CS Acquisition but still falsely recorded this amount in QFOR's accounting records as payments to the IRS.

71.      In 2014, QFOR entered into a payment plan with the IRS after a tax lien was filed related to one of these liabilities and another tax debt.  Though Thondavadi was aware of the lien and communicated details of the payment plan to QFOR's primary lender, QFOR still did not disclose this debt in its filings.

72.     Additionally, QFOR assumed more than $2.2 million in payroll tax liabilities to the IRS, State of California, and State of Michigan in connection with QFOR's acquisition of Teledata Technology Solutions, Inc. ("Teledata") in January 2013, but recorded in QFOR's accounting records only $1.2 million of the tax liabilities assumed.

73.     In March 2013, Thondavadi provided Auditor A with fraudulent versions of the Teledata deal documents that purported to cap all liabilities assumed.  Thondavadi also falsely told Auditor A that the amount of assumed tax liabilities was limited to $1.2 million.  Though QFOR negotiated down a portion of the tax liabilities and made some payments toward them, it never paid them off.  Instead, it consistently overstated to its auditors the size of the payments it had made.

74.     As a result, QFOR's payroll tax accrual was understated beginning as early as year-end 2012 through the third quarter of 2016, with the exception of two periods in 2013.

>        **ii.     Thondavadi and Desai knowingly caused QFOR to misrepresent the terms of a legal settlement and conceal related liabilities and cash payments.**

75.     **The Plaintiff A Settlement.**  In July 2011, QFOR, Desai, Thondavadi, and Associate A were sued in United States District Court by a New York-based lender ("Plaintiff A") for breach of contract.  In July 2013, the court found in favor of Plaintiff A and entered a judgment of approximately $692,000 against QFOR, Desai, Thondavadi, and Associate A. Plaintiff A then further sought payment of almost $1.2 million in legal fees as provided under the terms of the original contract.  In December 2013, Thondavadi and Desai executed a settlement agreement with Plaintiff A (the "Plaintiff A Settlement") that called for $1.75 million in cash payments to be made by QFOR to satisfy both the judgment and all legal fees.

76.     Thondavadi and Desai took affirmative steps to conceal from QFOR's investors and auditors the real terms of this settlement agreement.  Through the use of fraudulent and

forged documents, they misrepresented both the amount of the settlement and the means by which QFOR paid the settlement.

77. The July 12, 2013 judgment of $692,000 was disclosed in QFOR's public filings, including in the Form 10-Q for the second quarter of 2013, the Form 10-Q for third quarter of 2013, and the Form 10-K for year-end 2013 ("2013 Form 10-K"). Not disclosed, however, was Plaintiff A's July 25, 2013 motion for $1.2 million in legal fees and the eventual settlement agreement.

78. As of December 31, 2013, QFOR still owed $1.25 million under the settlement agreement. This liability was not disclosed in QFOR's 2013 Form 10-K.

79. In addition, defendants falsely claimed in numerous filings that the $692,000 judgment had been fully paid in 2013 by the issuance of QFOR stock to a third party as an assignment of the judgment. This misrepresentation was included in QFOR's 2013 Form 10-K and Form 10-K for year-end 2014 ("2014 Form 10-K").

80. To support this lie, Desai emailed fraudulent documents to QFOR's transfer agent on or about December 30, 2013, and Thondavadi emailed QFOR's auditors a fraudulent settlement agreement on or about February 21, 2014. These fraudulent settlement documents claimed that QFOR would issue $692,000 in stock to Stonegate, which would then pay all of QFOR's liabilities to Plaintiff A stemming from the lawsuit. The $692,000 in stock was issued to Stonegate, but Thondavadi and Desai – who controlled Stonegate – simply held that stock certificate. Thondavadi and Desai never disclosed to QFOR's auditors that they controlled Stonegate or the stock issued under this fake settlement agreement.

81. Thondavadi then caused QFOR to conceal the cash settlement payments to Plaintiff A, totaling over $1.8 million (including late payment fees), by falsely recording them as

payments related to two of the 2013 acquisitions (described below in paragraphs 97 to 121).

82.     As a result, numerous QFOR filings falsely represented the terms of the resolution of the Plaintiff A lawsuit, including the amount of the settlement and the means by which it was paid, including the 2013 and 2014 Forms 10-K and the Forms 10-Q for the second and third quarters of 2013 and 2014 and the second quarter of 2016.  The financial statements reported in the Form 10-Q for the first quarter of 2014 were also false, because over $1.3 million in payments made to Plaintiff A during that quarter were falsely recorded in QFOR's accounting records as other legitimate transfers.

### iii.     Thondavadi and Desai caused QFOR to conceal liabilities owed to certain private investor groups.

83.     **Investor Group A.**  In August 2013, QFOR rolled over approximately $1 million owed under two convertible debentures previously issued to a hedge fund ("Investor Group A"). As a result of this transaction, as of September 30, 2013, QFOR owed approximately $1.1 million to Investor Group A per a new convertible debenture.

84.     QFOR, Thondavadi, and Desai did not disclose this new liability.  Instead, in November 2013, Thondavadi falsely told Auditor A that the liabilities arising from the prior two debentures had been entirely paid off via the issuance of QFOR common stock on September 30, 2013.  To support this claim, Thondavadi provided Auditor A with forged documents purportedly signed by a representative of Investor Group A, including a consent to the stock payoff and audit confirmations that the prior debts had been extinguished.

85.     In November 2013, Desai sent the forged consent to QFOR's transfer agent to support his request for the issuance of stock, purportedly to pay off the debt.

86.     At Investor Group A's election, most of the monthly payments on the new debenture were made with QFOR stock.  Between February and August 2014, Desai repeatedly

directed the transfer agent to carve off portions of the block of stock fraudulently issued in connection with the phantom payoff in September 2013, in order to make these payments on the debt. These payments were also not properly reflected in QFOR's financial statements.

87.     Thondavadi and Desai concealed the few cash debt-service payments to Investor Group A when they falsely recorded at least one payment as an acquisition-related payment to a third party in QFOR's accounting records and made other payments from the Congruent and Stonegate bank accounts. They also falsely recorded a return of one cash debt-service payment by Investor Group A as a payment on false invoices in QFOR's accounting records.

88.     In all QFOR filings from the third quarter of 2013 through the second quarter of 2014, the liability under the August 2013 convertible debenture was omitted from QFOR's balance sheet and disclosures of notes payable and/or long-term debt. Moreover, in its 2013 Form 10-K, QFOR falsely stated that the prior two debts had been converted to QFOR stock as of September 30, 2013.

89.     **Investor Group B.** Between March 2014 and July 2014, QFOR raised $800,000 from a group of clients of a registered investment adviser, along with a fund of that adviser and one of its principals, (collectively, "Investor Group B") in an offering of promissory notes and warrants for the purchase of QFOR common stock. Desai executed individual promissory notes to each person in Investor Group B.

90.     QFOR never disclosed the Investor Group B offering or the liability either on its financial statements or to its auditors.

91.     In a May 15, 2014 email to Desai, a representative of Investor Group B asked where its notes were reported in QFOR's Form 10-Q for the quarter ended March 31, 2014. In

response, Thondavadi stated that the notes were part of the accrued expenses line item in QFOR's balance sheet. This was false.

92. Instead of being recorded in QFOR's accounting records as a liability or expense, at Thondavadi's direction, the incoming $800,000 was falsely recorded as payments on false invoices from various customers, in order to help conceal the loans.

93. Between 2015 and July 2016, QFOR made a variety of interest payments on the Investor Group B debt. Thondavadi sent some payments directly from QFOR (concealed as consulting expenses) and some through other bank accounts he controlled. In order to conceal the warrants issued to the Investor Group B individuals, QFOR falsely claimed the warrants were issued as part of a 2014 acquisition discussed below in paragraphs 123 to 124.

94. The Investor Group B investment was not paid off until July 2016. In each periodic filing for the first quarter of 2014 through the second quarter of 2016, QFOR, Thondavadi, and Desai omitted the liability under the Investor Group B investment from QFOR's balance sheet and disclosures of notes payable or long-term debt.

95. Due to the various hidden liabilities discussed in paragraphs 68 to 94 above, QFOR, Thondavadi, and Desai materially understated QFOR's current liabilities, long-term debt, and/or total liabilities in each periodic filing from the first quarter of 2013 through the second quarter of 2016, as set forth below:

|  | 2013 Q1 | 2013 Q2 | 2013 Q3 | 2013 YE | 2014 Q1 |
|---|---|---|---|---|---|
| **Total Undisclosed Liabilities** | **$ 1,574,658** | **$ 1,467,484** | **$ 1,471,870** | **$ 2,433,161** | **$ 2,170,060** |
| Current Liabilities Reported | $ 11,986,593 | $ 12,853,357 | $ 11,818,322 | $ 10,267,389 | $ 11,615,780 |
| % Understated | 11.61% | 10.25% | 10.85% | 19.16% | 15.74% |
| Total Liabilities Reported | $ 27,997,072 | $ 26,238,958 | $ 20,338,513 | $ 15,914,939 | $ 15,133,318 |
| % Understated | 5.32% | 5.30% | 6.75% | 13.26% | 12.54% |

25

|  | 2014 Q2 | 2014 Q3 | 2014 YE | 2015 Q1 | 2015 Q2 |
|---|---|---|---|---|---|
| Total Undisclosed Liabilities | $ 1,944,546 | $ 1,865,276 | $ 1,382,972 | $ 1,308,972 | $ 1,198,305 |
| Current Liabilities Reported | $ 11,356,188 | $ 11,574,895 | $ 11,813,954 | $ 12,421,686 | $ 15,435,882 |
| % Understated | 14.62% | 13.88% | 10.48% | 9.53% | 7.20% |
| Total Liabilities Reported | $ 14,473,726 | $ 14,692,433 | $ 17,648,642 | $ 19,664,814 | $ 21,530,293 |
| % Understated | 11.84% | 11.27% | 7.27% | 6.24% | 5.27% |

|  | 2015 Q3 | 2015 YE | 2016 Q1 | 2016 Q2 |
|---|---|---|---|---|
| Total Undisclosed Liabilities | $ 1,218,763 | $ 1,194,763 | $ 1,194,763 | $ 1,194,763 |
| Long Term Debt Reported | $ 5,022,327 | $ 4,338,763 | $ 4,110,851 | $ 4,208,896 |
| % Understated | 13.74% | 15.57% | 16.29% | 15.97% |
| Total Liabilities Reported | $ 20,928,716 | $ 20,888,132 |  |  |
| % Understated | 5.50% | 5.41% |  |  |

### E. Thondavadi and Desai Frequently Misrepresented QFOR Acquisition Terms as a Device to Mask Their Self-Dealing and Other Misconduct.

96.     Thondavadi and Desai concealed various aspects of their fraudulent conduct by causing QFOR to misrepresent the terms of at least seven acquisitions the company entered into between 2013 and 2015.  They disguised a portion of their misappropriation and QFOR's payment of undisclosed liabilities as acquisition-related expenses in QFOR's accounting records. They also used acquisitions as cover to issue stock and warrants, which they then diverted for their own enrichment and for other undisclosed corporate purposes.  In furtherance of their fraudulent scheme, Thondavadi and Desai lied about the terms of acquisitions in QFOR's public filings and often supported those lies by providing fraudulent acquisition documents to QFOR's auditors and transfer agent.

### i.     QFOR's 2013 Acquisitions

97.     QFOR's plan of growth through business combinations with other IT companies was consistently touted in its public filings, including QFOR's annual reports on Form 10-K.

26

98.     QFOR's Form 10-K for year-end 2012 (the "2012 Form 10-K") stated:  "The Company believes the best way to accomplish its strategic goals will be to initially seek to establish an IT services platform by acquiring a set of profitable assets with history, track record and satisfied client base.  After building the initial platform to launch the new business plan, the Company believes that it will be able to rapidly grow in targeted sectors by attracting additional assets to the Company with subsequent acquisitions."

99.     QFOR's 2012 Form 10-K disclosed:  "During the past year, the Company has identified and begun negotiations with several targets that qualify for [QFOR's] criteria for acquisition and business combination."

100.     In a note to the financial statements included in the 2012 Form 10-K ("Note 13 – Subsequent Events"), QFOR further disclosed three acquisitions it completed in early 2013, involving Teledata Technology Solutions, Inc. ("Teledata"), M2 Interactive Group, Inc. d/b/a Momentum Mobile ("Momentum Mobile"), and BlazerFish, LLC ("BlazerFish").  The deal terms reported for each transaction, however, were false.

101.     **Teledata.**  The 2012 Form 10-K stated that, effective January 1, 2013, QFOR had acquired the assets of Teledata and its subsidiaries "in exchange for (i) the assumption of certain liabilities of $5.1 million; (ii) cash of $900,000; (iii) earn-out payments equal to $1,500,000 as defined in the Agreement; [and] (iv) 3,000,000 common shares valued at $1 million."

102.     Thondavadi emailed a copy of an asset purchase agreement reflecting these terms to Auditor A on or about March 5, 2013.  This document, including the signature of Teledata's CEO, was a forgery.

103.    The actual Teledata sale agreement did not include any earn-out provision and required the delivery of only 475,000 shares of QFOR common stock (to Teledata's creditor), not 3,000,000 shares (purportedly to Teledata itself).

104.    In January 2013, Desai sent an email and letter to QFOR's transfer agent attaching a draft of the Teledata acquisition documents, requesting that 475,000 shares be issued and mailed directly to Teledata's creditor.  On or about July 31, 2013, Desai sent an email and letter to QFOR's transfer agent directing the transfer agent to issue an additional 3,000,000 shares in connection with the Teledata acquisition.  Thondavadi was copied on this email.  Desai directed the transfer agent to send the shares to Desai's attention at QFOR's business address, as opposed to delivering the shares to Teledata's creditor or individuals associated with Teledata.  Desai attached to the email a copy of the forged Teledata asset purchase agreement and forged board resolutions approving the share issuance requested for the acquisition.

105.    **Momentum Mobile**.  The 2012 Form 10-K stated that, effective February 1, 2013, QFOR had also acquired certain assets of Momentum Mobile "in exchange for (i) cash of $400,000; (ii) earn-out payments up to $800,000 as defined in the Agreement; [and] (iii) 1,000,000 common shares valued at $330,000."

106.    Thondavadi emailed a copy of an asset purchase agreement reflecting these terms to Auditor A on or about March 5, 2013.  This document, including the signatures for the two owners of Momentum Mobile, was a forgery.

107.    As set forth in the actual asset purchase agreement, QFOR's consideration for the Momentum Mobile assets was $100,000 cash (not $400,000), 65% of certain open accounts receivable, 250,000 shares of QFOR common stock (not 1,000,000 shares), earn-out payments of

up to 200,000 shares and a cash component dependent on performance (not up to $800,000), and approximately $212,000 of assumed liabilities (not disclosed by QFOR).

108.     In February 2013, Desai sent an email and letter to QFOR's transfer agent attaching the real Momentum Mobile acquisition documents, requesting that 250,000 shares be issued and mailed directly to Momentum Mobile's owners.  On or about July 31, 2013, Desai sent an email and letter to QFOR's transfer agent directing the transfer agent to issue an additional 750,000 shares in connection with the Momentum Mobile acquisition.  Thondavadi was copied on this email.  Desai directed the transfer agent to send the shares to Desai's attention at QFOR's business address, as opposed to delivering the shares to individuals associated with Momentum Mobile.  Desai attached to the email a copy of the forged Momentum Mobile asset purchase agreement and forged board resolutions approving the share issuance requested for the acquisition.

109.     **BlazerFish**.  The 2012 Form 10-K stated that, effective February 1, 2013, QFOR had acquired certain assets of BlazerFish "in exchange for: (i) cash of $250,000; (ii) earn-out payments equal to $600,000 as defined in the Agreement; [and] (iii) 3,000,000 common shares valued at $1,000,000."

110.     Thondavadi emailed a copy of an asset purchase agreement reflecting these terms to Auditor A on or about March 5, 2013.  This document, including the signature of BlazerFish's CEO, was a forgery.

111.     In reality, QFOR had acquired two related companies, Espreeva, Inc. ("Espreeva") and BlazerFish.  Under the real acquisition documents, the initial cash component of the combined purchase price was $250,000, as publicly reported by QFOR.  The Espreeva transaction, however, also provided for another $750,000 in cash to be paid in 48 monthly

installments of $15,625. Thondavadi directed QFOR's accounting personnel to conceal the $15,625 monthly payments to the owner of Espreeva by recording them in QFOR's accounting records as payments on unrelated liabilities, and later as payments for consulting services.

112.    Also, contrary to the information in QFOR's 2012 Form 10-K, the real acquisition documents did not contain an earn-out provision for either the Espreeva or BlazerFish transaction.

113.    The stock consideration agreed to by the parties was similarly misrepresented by QFOR in its 2012 Form 10-K. The parties actually agreed to the issuance of a total of 2,000,000 shares of QFOR stock, not the 3,000,000 shares QFOR publicly disclosed.

114.    Nonetheless, on or about June 4, 2013 and August 16, 2013, Desai sent emails and letters to QFOR's transfer agent directing the transfer agent to issue a total of 3,000,000 shares in connection with the BlazerFish acquisition: 2,000,000 shares in the name of various employees and owners of BlazerFish and Espreeva, and a total of 1,000,000 shares in the name of BlazerFish, LLC. The excess 1,000,000 shares in the name of BlazerFish, LLC were never distributed to the former owners of BlazerFish or Espreeva.

115.    Later, in QFOR's 2013 Form 10-K, the company announced that the BlazerFish acquisition had been amended as of September 2013, and that the total stock consideration for the acquisition was now 6,700,000 shares valued at $1,900,000. To support the claim that additional shares of stock had been issued in connection with this transaction, Thondavadi provided to Auditor A an amended asset purchase agreement. This document, which actually called for an additional 4,000,000 shares of QFOR stock and included the signature of BlazerFish's CEO, was also a forgery.

116.     On or about September 30, 2013, Desai sent an email and letter to QFOR's transfer agent directing the transfer agent to issue a total of 4,000,000 additional shares to BlazerFish.  These shares were never distributed to the former owners of BlazerFish or Espreeva and remained under the effective control of Thondavadi and Desai.

117.     The false acquisition terms for Teledata, Momentum Mobile, and BlazerFish described in QFOR's 2012 Form 10-K were also included in a Form 8-K filed on March 1, 2013 (combined together), the Forms 10-Q for each quarter in 2013 and 2014, and the 2013 and 2014 Forms 10-K.

118.     By overstating the consideration QFOR agreed to pay in these transactions, Thondavadi and Desai created fictitious financial obligations for the company which they then used to camouflage and offset payments made for their own personal benefit or for undisclosed liabilities of QFOR.  Funds that flowed out of QFOR bank accounts for improper or undisclosed reasons were thus booked as seemingly legitimate business payments.

119.     For example, QFOR's accounting records reflected $1.4 million in Teledata tax and earn-out payments that, in reality, were payments to Congruent, Global Technology, CS Acquisition, Creditor A, Creditor C, or Plaintiff A.

120.     Likewise, over $770,000 recorded in QFOR's accounting records as Momentum Mobile earn-out payments, and $190,000 recorded in QFOR's accounting records as BlazerFish earn-out payments, were simply misleading labels affixed to payments actually made to Congruent, Global Technology, CS Acquisition, Stonegate, Creditor D, or Plaintiff A.

121.     These false accounting entries resulted in false financial information being included in QFOR's quarterly and annual reports filed with the Commission.  For example, QFOR's 2013 Form 10-K falsely overstated the amount of stock issued in connection with the

above-described 2013 acquisitions by a total of at least 7,975,000 shares. The payments to personal and QFOR creditors concealed as acquisition-related payments also caused various entries in the quarterly and annual financial statements to be misleading.

### ii. QFOR's May 2014 and October 2015 acquisitions.

122. Due to the misconduct of Thondavadi and Desai, QFOR's public filings falsely described the terms of later acquisitions as well.

123. **Customer A**. A media company ("Customer A") was one of QFOR's largest customers in 2014 and 2015. QFOR and Customer A entered into a long-term agreement on May 1, 2014, pursuant to which QFOR was to provide services supporting Customer A's digital operations. That same day, QFOR entered into an asset purchase agreement with Customer A, pursuant to which, and for consideration of ten dollars ($10), QFOR purchased equipment and assumed certain liabilities related to the support services QFOR was to provide Customer A.

124. QFOR's periodic filings from the second quarter of 2014 through year-end 2015, however, falsely stated that the consideration for the Customer A asset purchase included the issuance of 2 million warrants, valued at approximately $977,000. Thondavadi emailed a false version of the Customer A asset purchase agreement to Auditor B on or about May 19, 2015 as supporting documentation for the information in QFOR's filings. The 2 million warrants were not part of the actual agreement with Customer A and were not in fact issued to Customer A. Instead, approximately 1.2 million were issued to former Customer A employees, and 800,000 were issued to investors in the Investor Group B offering.

125. **TAI**. Also in May 2014, QFOR purportedly entered into the asset purchase agreement with TAI, described above in paragraphs 60 to 62. Two different versions of the TAI asset purchase agreement, both of which were signed by Thondavadi, were provided to QFOR's

32

auditors. Thondavadi emailed one version of the asset purchase agreement to Auditor A on or about August 5, 2014 and the other to Auditor B on or about April 30, 2015 in connection with their respective audits and reviews. Desai emailed one of the versions to QFOR's transfer agent on or about June 27, 2014 to support the issuance of stock.

126. In the following months, Thondavadi and Desai diverted the approximately 4.4 million shares of stock issued to TAI for their personal use, as described above, and for other QFOR corporate purposes, including distributing approximately 1.4 million shares originally issued to TAI to QFOR employees and to entities and individuals as consideration for other QFOR acquisitions.

127. QFOR made numerous filings with the Commission that misrepresented the terms of the May 2014 acquisitions, including the company's Forms 10-Q for the second and third quarters of 2014 and each quarter of 2015, its 2014 Form 10-K, and its Form 10-K for year-end 2015 ("2015 Form 10-K").

128. **DUS**. In October 2015, QFOR acquired DUS Corporation ("DUS"), a privately held business controlled by Associate A, in exchange for $75,000 in QFOR stock. In connection with this acquisition, QFOR acquired certain assets and purportedly assumed $2.95 million in accounts payable.

129. The $2.95 million in liabilities purportedly assumed in connection with the DUS transaction were fictitious. Instead of paying actual expenses or accounts payable, QFOR used these fictitious liabilities as cover to engage in round-trip transactions using bank accounts controlled by Thondavadi and Associate A. Specifically, in a series of transactions between October 2015 and March 2016 (at least one of which was effected by Thondavadi, and others effected at Thondavadi's direction), QFOR wired $2.95 million to a bank account controlled by

Associate A and Thondavadi and recorded these transfers as payments on the purported liabilities assumed in the acquisition in QFOR's accounting records. These funds were immediately transferred to a CS Acquisition bank account, which was controlled by Thondavadi, and then were used to engage in further round-trip transactions with QFOR.

130. Even after the assumed liabilities were reported as paid off, QFOR continued to transfer another $1.2 million to the account controlled by Associate A and Thondavadi, recording them in QFOR's accounting records as vendor payments. These funds were immediately thereafter transferred to a CS Acquisition bank account and yet another account controlled by Associate A and Thondavadi.

131. QFOR made numerous filings with the Commission that misrepresented the terms of the October 2015 acquisition involving DUS, including the company's 2015 Form 10-K and its Forms 10-Q for each quarter of 2015.

132. QFOR's misstatement of the terms of the May 2014 and October 2015 acquisitions also caused the company's intangible assets and total assets to be overstated in its Forms 10-Q for the second quarter of 2014 through at least the second quarter of 2016 and its 2014 and 2015 Forms 10-K, and its goodwill to be overstated in its 2015 Form 10-K and Forms 10-Q for each quarter of 2016.

133. In connection with the May 2014 acquisitions, QFOR recorded in its accounting records nearly $3 million in intangible assets, the valuation of which was based on the reported costs of the two acquisitions, specifically the 2 million warrants reportedly issued as part of the Customer A acquisition and the approximately 4.4 million shares of stock issued to TAI. Because these acquisition costs were invented by Thondavadi and Desai, QFOR's net intangible

assets and total assets were overstated by approximately $2.7 million (8.3% of reported total assets) and $2.3 million (6.1% of reported total assets) at year-end 2014 and 2015, respectively.

134.    In connection with the October 2015 DUS transaction, QFOR recorded in its accounting records approximately $2 million in goodwill, the valuation of which was largely based on the reported costs of the acquisition, including the $2.95 million in liabilities that QFOR reportedly assumed in connection with the transaction.  Because these liabilities were fictitious, QFOR materially overstated its goodwill and total assets in its 2015 Form 10-K by at least $2 million (5.4% of reported total assets), solely as a result of this transaction.

      **F.**      **Thondavadi and Desai Inflated QFOR's Revenues Through the Use of False Customer Invoices, Typically Paid in Round-Trip Transactions.**

135.    Thondavadi's and Desai's efforts to create an improved financial picture for QFOR included another category of misconduct:  improper revenue recognition in the form of fictitious sales and round-trip transactions.  From at least 2013 through June 2015, Thondavadi and Desai caused QFOR accounting staff to record fictitious revenue and receivables into the company's accounting records.  To further the scheme, Thondavadi and Desai supported the fictitious entries with false sales documents.  They then paid many of the false receivables with QFOR's money, which had been funneled through their own private companies in order to give the appearance of legitimate transactions.  This fraudulent conduct inflated QFOR's revenue and receivables, and consequently caused QFOR's quarterly and annual revenue for 2014 to be materially overstated in its public filings.

136.    Beginning in at least 2013, Thondavadi and Desai directed employees to record revenue and enter fake invoices for nonexistent services to real customers.  To avoid detection or the need to write off the false receivables, QFOR recorded false payments on these invoices in its accounting records.  For example, on a quarterly basis beginning at least by 2013, Thondavadi

directed QFOR employees to "rotate" funds through the CS Acquisition bank account and other accounts he controlled and record them as payments on the false invoices. Thondavadi also directed QFOR employees to record non-revenue sources of cash as payments on fake invoices, including the proceeds of loans and stock sales.

137.    In March 2015, in connection with their audit of the 2014 financial statements, Auditor A discovered that QFOR had recorded in its accounting records invoices for services never provided and that unknown individuals affiliated with QFOR had returned fraudulent audit confirmations to Auditor A. Auditor A resigned on April 2, 2015, citing concerns over management integrity, and submitted a letter to the Commission outlining their concerns the same day pursuant to Section 10A of the Exchange Act.

138.    QFOR filed a Form 8-K on April 14, 2015, signed by Desai, in which it disclosed Auditor A's resignation and explained that Auditor A had determined "there were certain irregularities with regard to up to 20 sales invoices which were erroneously invoiced with inconsistent or improper supporting expense invoices from employees or subcontractors for the Company" and it appeared "that as many as 8 to 10 verifications were signed by employees or subcontractors for the Company instead of a responsible officer for the specific clients of the Company to whom the verification requests were addressed." The Form 8-K also disclosed that QFOR had started an internal investigation.

139.    In the following months, QFOR's audit committee purported to conduct an internal investigation of the issues raised by Auditor A, but Thondavadi and Desai blamed unknown employees of affiliated Q4 India for the false invoices and confirmations.

140.    In April 2015, QFOR engaged Auditor B as its new auditors. After Auditor A's resignation and before Auditor B began its audit work, Thondavadi, Desai, and other QFOR

36

employees met in QFOR's New Jersey offices and reclassified $2.7 million in false invoices and payments originally attributed to real customers.

141.    They attributed these invoices and payments to a new customer called Cynosure Corporation ("Cynosure"), a sham entity created and controlled by Thondavadi:

- On or about April 5, 2015, Thondavadi registered a domain name and created a web site for Cynosure.

- On or about April 14, 2015, Thondavadi rented virtual office space for Cynosure in Fort Worth, Texas, using a UPS box rented by Thondavadi as its address.

- On or about April 16, 2015, Cynosure was incorporated in Illinois, with the same UPS box as its address.

142.    The office space mailing address, email address, and web site were intended by Thondavadi to deceive QFOR's auditors into believing that Cynosure was a real customer. Specifically, any audit confirmations for Cynosure invoices would be sent by mail or email to a mailing address and email that the defendants controlled, thus enabling them to easily falsify any confirmation from the "customer."

143.    On April 22, 2015, Thondavadi also opened a new bank account in Cynosure's name, with Associate A as the ostensible sole signatory.  At all relevant times, Thondavadi directed the activity in this account.  At Thondavadi's direction and using information he provided, QFOR staff effected transactions in the account using Associate A's login credentials and physical security token.  All of the payments on invoices attributed to Cynosure originated from bank accounts and other sources QFOR controlled, or other non-revenue sources of cash.

144.     By April 2015, QFOR had recorded in its accounting records more than $2.7 million in false invoices for twelve QFOR customers and more than $1.7 million in false payments on these invoices.

145.     Between April 7 and April 18, 2015, QFOR reclassified all of these invoices and payments and attributed them to Cynosure, and also falsely recorded in its accounting records additional payments from Cynosure (dating the payments in January and February 2015).

146.     Rather than coming from real customers or Cynosure, the payments that had been made by April 2015 came from funds round-tripped through a CS Acquisition bank account and other non-revenue sources of cash, including stock sales and loans.

147.     After the April 2015 reclassification of false invoices and payments, QFOR recorded in its accounting records an additional approximately $227,000 in false invoices to Cynosure through June 30, 2015.  Between May and October 2015, at Thondavadi's direction, QFOR accounting staff effected transfers from the new Cynosure bank account to pay off the outstanding Cynosure accounts receivable.  The funds that passed through the Cynosure bank account all originated from bank accounts controlled by QFOR, Thondavadi, and/or Desai.

148.     During at least ten different quarters during the years 2013 through 2015, defendants caused QFOR staff to create and record a succession of journal entries in QFOR's accounting records that had the cumulative effect of creating millions of fictitious revenue.

149.     QFOR recorded in its accounting records at least $767,585 in false revenue in 2013 (2.1% overstatement), $4,264,106 in 2014 (9.6% overstatement), and $393,380 in 2015 (0.8% overstatement).  QFOR therefore materially overstated its revenue for each quarter and for year-end 2014, as reported in its 2014 Form 10-K and its Forms 10-Q filed for each quarter of

2014. QFOR's materially overstated 2014 revenue was reported again in QFOR's 2015 Form 10-K and its Forms 10-Q filed for each quarter of 2015.

### G. Defendants Failed to Disclose Related Party Transactions and Thondavadi's and Desai's Full Stock Holdings

150. In each of its Forms 10-K for year-end 2012 through 2015, QFOR falsely stated that it had not engaged in any related party transactions.

151. In reality, as alleged herein, QFOR engaged in numerous undisclosed related party transactions with Q4 India and various entities controlled by Thondavadi and Desai, including Global Technology, Congruent, CS Acquisition, Cynosure, CITS, Surrex, and Stonegate. For example:

   a. As discussed in paragraph 153 below, QFOR's transactions with Q4 India between 2012 and 2016 were related party transactions.

   b. QFOR transferred money to and from Global Technology, Congruent, and CS Acquisition on a regular basis throughout 2012 through 2016. Additionally, QFOR reported that it borrowed money from Global Technology in 2013 and 2015, and it reported that it paid off the 2013 loan by issuing stock to Global Technology. These transactions were related party transactions.

   c. QFOR's 2014 and 2015 reported revenue from Cynosure, CITS, and Surrex was the result of related party transactions.

   d. QFOR engaged in related party transactions with Stonegate in 2012 and 2013, including a loan that was converted to stock in September 2013 and the December 2013 stock issuance to Stonegate that QFOR, Thondavadi, and Desai falsely claimed was conducted to satisfy Plaintiff A's judgment.

39

152.    These transactions resulted in the channeling of company funds and stock into entities controlled by Thondavadi and Desai for a variety of purposes, including for Thondavadi's and Desai's personal use as well as for payments on undisclosed liabilities and fictitious accounts receivables. Over $4.1 million of company funds and assets were diverted to Thondavadi and Desai without adequate disclosure to investors.

153.    On September 23, 2016, QFOR filed a Form 10-K/A for the year ending December 31, 2015 ("2015 Form 10-K/A"), and partially disclosed for the first time certain related party transactions. For example, in the 2015 Form 10-K/A, QFOR made partial disclosures that: (a) Global Technology and Congruent were inactive entities controlled by Thondavadi and Desai, respectively; (b) CITS and Surrex were related parties and the revenue QFOR received from those entities in 2014 and 2015 was a result of related party transactions; and (c) Stonegate (an affiliate by virtue of its QFOR stock holdings) owned Q4 India until at least May 2016, and, therefore, QFOR's transactions with Q4 India were related party transactions. The disclosures were incomplete, however, because the 2015 Form 10-K/A omitted additional facts relating to QFOR's and Thondavadi's control over CITS and Surrex; Thondavadi's and Desai's control over Stonegate; and QFOR's numerous related party transactions with Global Technology, Congruent, and Stonegate. The 2015 Form 10-K/A also failed to disclose any of QFOR's related party transactions involving CS Acquisition and Cynosure.

154.    In each of its Forms 10-K for year-end 2012 through 2015 and the 2015 Form 10-K/A, QFOR materially understated Thondavadi's and Desai's beneficial ownership of QFOR stock.

40

155.     The 2015 Form 10-K/A claimed to correct QFOR's disclosure of management's stock holdings by disclosing that: (a) Thondavadi's beneficial ownership of QFOR common stock was understated by 2,493,287 shares (2.3% of outstanding shares), including 993,287 shares held in the name of Global Technology; and (b) Desai's beneficial ownership of QFOR common stock was understated by 4,996,916 shares (4.6% of outstanding shares), including 750,000 shares held by an unnamed corporation. Thondavadi and Desai had beneficially owned at least some of these omitted blocks of stock since at least 2012, but had never previously disclosed them.

156.     The 2015 Form 10-K/A and the Forms 10-K for year-end 2012 through 2015 also omitted to disclose additional QFOR common stock held by entities Thondavadi and/or Desai controlled and other nominees, including stock held by Congruent Ventures Ltd. and in brokerage accounts controlled by Desai and his wife; stock held by Stonegate and Stonegate Assets; and the stock certificates issued in the names of Teledata, Momentum Mobile, and BlazerFish, which remained under Thondavadi's and Desai's effective control.

**H.     Thondavadi and Desai Raised Money through Undisclosed Fraudulent Offerings.**

157.     QFOR experienced cash flow difficulties for much of the time period from 2013 to mid-2016, particularly in late 2013 and early 2014 when payments on the Plaintiff A Settlement were due. QFOR's cash flow problems were also exacerbated by Thondavadi's and Desai's misappropriation.

158.     Between August 2013 and November 2016, QFOR raised money through, among other means, a series of private offerings, including at least two that QFOR did not disclose in its periodic filings, as described in paragraphs 83 to 94 above.

### i. August 2013 Investor Group A Offering.

159. As described in paragraphs 83 to 88 above, in August 2013, QFOR rolled over two convertible debentures previously issued to Investor Group A into a new convertible debenture with a face value of approximately $1.1 million. The August 2013 securities purchase agreement executed in connection with this transaction, which was signed by Thondavadi, falsely represented that: (1) none of QFOR's SEC filings contained any misstatements; and (2) QFOR did not engage in any related party transactions except as set forth in the SEC filings.

160. In connection with this investment, Investor Group A was referred to and reviewed QFOR's 2012 Form 10-K and its Forms 10-Q for the first two quarters of 2013, all of which contained several material misstatements. Specifically, those filings contained material misstatements as to QFOR's liabilities, acquisitions, and related party transactions, as well as cash disbursements to or for management and management's stock holdings.

161. In addition, the August 2013 securities purchase agreement included a master debt schedule for QFOR, which purported to list all of QFOR's creditors and the terms of the debt. Included in this debt schedule were two related parties: Stonegate and Global Technology. QFOR did not disclose to Investor Group A that these were both related parties. Moreover, the Global Technology note was fraudulent, as it was premised on funds round-tripped from QFOR to Global Technology and back as described in paragraph 59 above. Finally, this master debt schedule omitted QFOR's liabilities to tax authorities, totaling nearly $1.5 million as of the end of the prior quarter.

### ii. December 2014 Investor Group A Offering.

162.     After the August 2013 convertible debenture had been fully paid off, Investor Group A entered into another convertible debenture with QFOR totaling $1.2 million in December 2014.

163.     The December 2014 securities purchase agreement executed in connection with this transaction, which was signed by Thondavadi, falsely represented that:  (1) none of QFOR's SEC filings contained any misstatements; (2) QFOR did not engage in any related party transactions except as set forth in the SEC filings; and (3) QFOR had not incurred any new liabilities not included in any of the SEC filings.

164.     In connection with this investment, Investor Group A was referred to and reviewed QFOR's 2013 Form 10-K and its Forms 10-Q for the first three quarters of 2014, which included several material misstatements as to QFOR's revenue, liabilities, assets, acquisitions, and related party transactions, as well as cash disbursements to or for management and management's stock holdings.

165.     In addition, the securities purchase agreement included a master debt schedule for QFOR, which purported to list all of QFOR's creditors and the terms of the debt.  However, this master debt schedule omitted QFOR's liabilities to tax authorities (over $1 million as of the end of the prior quarter) and QFOR's debt to Investor Group B (over $800,000 as of the end of the prior quarter).

### iii. 2014 Investor Group B Offering.

166.     As described in paragraphs 89 to 94 above, in March and July of 2014, QFOR raised a total of $800,000 from individuals in Investor Group B in an offering of promissory notes and warrants for the purchase of QFOR common stock.  QFOR raised $500,000 in March

2014 and another $300,000 in July 2014. Desai executed investment documents on behalf of QFOR to each individual investor in the March 2014 and July 2014 investments.

167.   Before making the March 2014 investments, Investor Group B was referred to and reviewed QFOR's 2013 Form 10-K, which included several material misstatements, including as to QFOR's liabilities, acquisitions, and related party transactions, as well as cash disbursements to or for management and management's stock holdings.

168.   Before making the July 2014 investments, Investor Group B was referred to and reviewed QFOR's 2013 Form 10-K and its Form 10-Q for the first quarter of 2014, which included several material misstatements as to QFOR's revenue, liabilities, acquisitions, and related party transactions, as well as cash disbursements to or for management and management's stock holdings. Additionally, as described in paragraph 91 above, Thondavadi made a verbal misrepresentation about where the March 2014 notes were reported in QFOR's financial statements.

### iv.   September 2014 Individual Investor A Offering.

169.   As described in paragraphs 60 to 62 above, QFOR, Thondavadi, and Desai offered and sold QFOR common stock originally issued to TAI to individual investors in September 2014. One of the individual investors in that transaction ("Individual Investor A") purchased 2 million shares of QFOR common stock for $1.12 million, which was split between Thondavadi, Desai, and QFOR. In the fall of 2014, QFOR offered common stock and convertible debentures to Individual Investor A, but the transaction was never consummated.

170.   In connection with these offerings, Individual Investor A was referred to and reviewed QFOR's 2013 Form 10-K and its Forms 10-Q for the first two quarters of 2014, which included several material misstatements as to QFOR's revenue, liabilities, assets, acquisitions,

and related party transactions, as well as cash disbursements to or for management and management's stock holdings.

171.    In addition, Thondavadi and Desai made verbal statements to Individual Investor A that they did not take any salary from QFOR.  These statements were false or misleading because Thondavadi and Desai were receiving substantial, regular payments from QFOR, which they did not disclose to Individual Investor A.

<strong>v.      November 2016 Investor Group C Offering.</strong>

172.    In November 2016, QFOR raised $5.075 million from a private investment fund ("Investor Group C") in an offering of a promissory note and warrants to purchase QFOR common stock.

173.    Before making this investment, Investor Group C was referred to and reviewed QFOR's 2015 Form 10-K, its 2015 Form 10-K/A, and its Form 10-Q for the second quarter of 2016, all of which included several material misstatements as to QFOR's revenue, liabilities, assets, acquisitions, and related party transactions, as well as cash disbursements or for to management and management's stock holdings.

**I.      Thondavadi's and Desai's Management of QFOR Comes to an End.**

174.    On October 27, 2016, QFOR filed a Form 8-K with the Commission disclosing that Auditor B had resigned on October 21, 2016, citing concerns about its ability to rely on management's representations as a result of information regarding related party transactions included in QFOR's 2015 Form 10-K/A, and that QFOR had engaged new auditors.

175.    On December 6, 2016, QFOR filed a Form 8-K with the Commission disclosing that Thondavadi and Desai had resigned the day prior from all officer and employee positions with the company and its subsidiaries.

45

176.     The December 6, 2016 Form 8-K further disclosed that on November 30, 2016, Thondavadi and Desai were arrested and criminally charged with, among other things, wire fraud and corporate officer certification of financial reports that do not fairly present, in all material respects, the financial condition of the company.

177.     On December 15, 2016, QFOR filed a Form 8-K disclosing that the company's board of directors had concluded that QFOR's financial statements for the previous three years do not fairly present the financial condition of the company, require restatement, and should no longer be relied upon.  No restatement has occurred to date.

## FIRST CLAIM FOR RELIEF

**Violations of the Antifraud Provisions of the Exchange Act:**
**Section 10(b) and Rule 10b-5**
**(All Defendants)**

178.     The Commission repeats and incorporates by reference the allegations in paragraphs 1 through 177 above.

179.     By virtue of the conduct alleged herein, defendants, directly or indirectly, acting knowingly or recklessly, in connection with the purchase or sale of securities, by the use of means and instrumentalities of interstate commerce, or of the mails, or a facility of a national securities exchange:  (a) have employed or are employing devices, schemes, or artifices to defraud; (b) have made or are making untrue statements of material fact or have omitted or are omitting to state a material fact necessary to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) have engaged or are engaging in acts, practices, or courses of business which operate as a fraud or deceit upon certain persons.

180.    As a result, defendants have violated and, unless enjoined, will continue to violate Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## SECOND CLAIM FOR RELIEF

**Violations of the Antifraud Provisions of the Securities Act:
Sections 17(a)(1), 17(a)(2), and 17(a)(3)
(All Defendants)**

181.    The Commission repeats and incorporates by reference the allegations in paragraphs 1 through 177 above.

182.    By virtue of the conduct alleged herein, defendants, directly or indirectly, acting knowingly or recklessly, in the offer or sale of securities, by the use of means or instruments of transportation or communication in interstate commerce, or of the mails:  (a) have employed or are employing devices, schemes, or artifices to defraud; (b) have obtained or are obtaining money or property by means of untrue statements of material fact or omissions to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) have engaged or are engaging in transactions, practices, or courses of business which operate as a fraud or deceit upon purchasers of the securities.

183.    As a result, defendants have violated and, unless enjoined, will continue to violate Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

## THIRD CLAIM FOR RELIEF

**Violations of Reporting Provisions of the Exchange Act:
Section 15(d) and Rules 12b-20, 15d-1, 15d-11, and 15d-13
(QFOR)**

184.    The Commission repeats and incorporates by reference the allegations in paragraphs 1 through 177 above.

185. Section 15(d) of the Exchange Act [15 U.S.C. § 78o(d)] and Rules 15d-1, 15d-11, and 15d-13 thereunder [17 C.F.R. §§ 240.15d-1, 240.15d-11, 240.15d-13], require certain issuers who have filed a registration statement that has become effective pursuant to the Securities Act to file with the Commission factually accurate current, quarterly, and annual reports (on Forms 8-K, 10-Q, and 10-K respectively). Rule 12b-20 [17 C.F.R. § 240.12b-20] further provides that, in addition to the information expressly required to be included in a statement or report, there shall be added such further material information, if any, as may be necessary to make the required statements, in light of the circumstances under which they were made, not misleading.

186. As alleged herein, from 2013 through 2016, QFOR filed with the Commission current, quarterly, and annual reports on Forms 8-K, 10-Q, and 10-K that contained untrue statements of material fact and omitted to state material information required to be stated therein or necessary in order to make required statements, in the light of the circumstances under which they were made, not misleading. In these reports, QFOR materially misrepresented, failed to disclose, and/or made materially misleading statements concerning the company's revenues, acquisitions, assets, liabilities, related party transactions, cash disbursements to or for management, and management's stock holdings.

187. As a result, QFOR has violated and, unless enjoined, will continue to violate, Section 15(d) of the Exchange Act and Rules 12b-20, 15d-1, 15d-11, and 15d-13 thereunder.

## FOURTH CLAIM FOR RELIEF

### Aiding and Abetting Violations of Section 15(d) of the Exchange Act and Rules 12b-20, 15d-1, 15d-11, and 15d-13 thereunder
### (Thondavadi and Desai)

188. The Commission repeats and incorporates by reference the allegations in paragraphs 1 through 177 above.

189. As set forth above, QFOR committed violations of Section 15(d) of the Exchange Act and Rules 12b-20, 15d-1, 15d-11, and 15d-13 thereunder, because QFOR's required reports to the Commission materially misrepresented, failed to disclose, and/or made materially misleading statements concerning the company's revenues, acquisitions, assets, liabilities, related party transactions, cash disbursements to or for management, and management's stock holdings.

190. Thondavadi and Desai prepared, approved, signed, and/or certified materially misleading public filings of QFOR, and knew, or were reckless in not knowing, that those public filings contained false and misleading information.

191. By virtue of the conduct alleged herein, Thondavadi and Desai aided and abetted, and pursuant to Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)] each is therefore liable for, the primary violations committed by QFOR of Section 15(d) of the Exchange Act and Rules 12b-20, 15d-1, 15d-11, and 15d-13 thereunder, because Thondavadi and Desai knowingly or recklessly provided substantial assistance to QFOR in making materially misleading public filings in violation of these provisions. Unless enjoined, Thondavadi and Desai will likely again aid and abet violations of these provisions.

## FIFTH CLAIM FOR RELIEF

**Violations of the Books and Records and Internal Control Provisions of the Exchange Act:**
**Sections 13(b)(2)(A) and Sections 13(b)(2)(B)**
**(QFOR)**

192. The Commission repeats and incorporates by reference the allegations in paragraphs 1 through 177 above.

193. From at least 2012 through 2016, QFOR failed to: (a) make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflected the transactions and dispositions of its assets; and (b) devise and maintain a system of internal accounting

49

controls sufficient to provide reasonable assurances that, among other things, transactions were recorded as necessary to permit preparation of financial statements in conformity with generally accepted accounting principles or any other criteria applicable to such statements, and to maintain accountability for assets.

194.    As a result, QFOR has violated and, unless enjoined, will continue to violate, Sections 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act [15 U.S.C. §§ 78m(b)(2)(A) and 78m(b)(2)(B)].

## SIXTH CLAIM FOR RELIEF

### Aiding and Abetting Violations of Sections 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act (Thondavadi and Desai)

195.    The Commission repeats and incorporates by reference the allegations in paragraphs 1 through 177 above.

196.    As set forth above, QFOR committed violations of Sections 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act.

197.    By virtue of the conduct alleged herein, Thondavadi and Desai aided and abetted, and pursuant to Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)] each is therefore liable for, the primary violations committed by QFOR of Sections 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act, because Thondavadi and Desai knowingly or recklessly provided substantial assistance to QFOR's violations of these provisions.  Unless enjoined, Thondavadi and Desai will likely again aid and abet violations of these provisions.

## SEVENTH CLAIM FOR RELIEF

### Circumventing Internal Controls and Falsifying Books and Records in Violation of: Section 13(b)(5) of the Exchange Act (Thondavadi and Desai)

198.    The Commission repeats and incorporates by reference the allegations in paragraphs 1 through 177 above.

199.     Through the conduct alleged herein, Thondavadi and Desai knowingly circumvented or knowingly failed to implement a system of internal accounting controls at QFOR and knowingly falsified QFOR's books, records, and accounts subject to Section 13(b)(2) of the Exchange Act.

200.     As a result, Thondavadi and Desai have violated and, unless enjoined, will continue to violate Section 13(b)(5) of the Exchange Act [15 U.S.C. § 78m(b)(5)].

## EIGHTH CLAIM FOR RELIEF

**Falsifying Books and Records in Violation of:**
**Rule 13b2-1 under the Exchange Act**
**(Thondavadi and Desai)**

201.     The Commission repeats and incorporates by reference the allegations in paragraphs 1 through 177 above.

202.     Through the conduct alleged herein, Thondavadi and Desai directly and indirectly falsified and caused to be falsified QFOR's books, records, and accounts subject to Section 13(b)(2)(A) of the Exchange Act.

203.     As a result, Thondavadi and Desai have violated and, unless enjoined, will continue to violate Rule 13b2-1 under the Exchange Act [17 C.F.R. § 240.13b2-1].

## NINTH CLAIM FOR RELIEF

**Misrepresentations and Misconduct in Connection**
**with the Preparation of Required Reports in Violation of:**
**Rule 13b2-2 under the Exchange Act**
**(Thondavadi and Desai)**

204.     The Commission repeats and incorporates by reference the allegations in paragraphs 1 through 177 above.

205.     As alleged herein, Thondavadi and Desai each made or caused to be made materially false or misleading misstatements, or omitted to state, or caused another person to omit to state, material facts necessary in order to make statements made, in light of the

circumstances under which such statements were made, not misleading, to an accountant in connection with (i) an audit, review or examination of the financial statements of QFOR required to be made pursuant to Commission rules, or (ii) the preparation or filing of documents or reports required to be filed with the Commission.

206.     Thondavadi, as QFOR's CEO, knowingly made multiple material false and misleading oral and written statements to accountants during the preparation of QFOR's annual and quarterly reports and the audits and reviews of the company's financial statements.  Among other misstatements, he made material misrepresentations and omissions of material facts in management representation letters, including misstatements regarding the proper recording of material transactions (such as acquisitions) and omissions regarding certain related party transactions and outstanding liabilities.  He provided a variety of fraudulent documents to QFOR's auditors, including fraudulent acquisition documents related to QFOR acquisitions (Teledata, Momentum Mobile, BlazerFish and Customer A), a fraudulent settlement agreement with Plaintiff A, a fraudulent document purporting to memorialize a non-existent consulting agreement with Creditor D, a false consent to convert Investor Group A's debt to stock, and false confirmations that the debt to Investor Group A had been extinguished.  He made material misrepresentations and omissions in emails and oral discussions with the auditors regarding topics including cash disbursements to or for management and management's stock holdings.

207.     Desai, as QFOR's CFO and Chairman, also knowingly made multiple material false and misleading oral and written statements to accountants during the preparation of QFOR's annual and quarterly reports and the audits and reviews of the company's financial statements.  He made material misrepresentations and omissions of material facts in management representation letters, including misstatements regarding the proper recording of material

52

transactions (such as acquisitions) and omissions regarding certain related party transactions and outstanding liabilities. He made material misrepresentations and omissions in emails and oral discussions with the auditors regarding topics including cash disbursements to or for management and management's stock holdings.

208. As a result, Thondavadi and Desai have violated and, unless enjoined, will continue to violate Rule 13b2-2 under the Exchange Act [17 C.F.R. § 240.13b2-2].

<strong><u>TENTH CLAIM FOR RELIEF</u></strong>

<strong>False Certifications in Violation of:<br>Rule 15d-14 under the Exchange Act<br>(Thondavadi and Desai)</strong>

209. The Commission repeats and incorporates by reference the allegations in paragraphs 1 through 177 above.

210. Thondavadi, as CEO, and Desai, as CFO, each signed false certifications pursuant to Rule 15d-14 under the Exchange Act [17 C.F.R. § 240.15d-14] that were included in: QFOR's annual reports on Form 10-K for year-end 2012, 2013, 2014, and 2015; QFOR's quarterly reports on Form 10-Q for each quarter of 2013, 2014, 2015, and 2016; and QFOR's annual report on Form 10-K/A for year-end 2015.

211. In the certifications included with these annual and quarterly reports, Thondavadi and Desai each falsely stated, among other things, that: (a) each report did not contain any untrue statement of material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading; (b) the financial statements, and other financial information included in the report, fairly presented in all material respects the financial condition, results of operations, and cash flows of QFOR as of, and for, the periods presented in the report; and (c) that he had disclosed to QFOR's auditor and audit committee all significant deficiencies and material weaknesses in the design or

operation of internal control over financial reporting and any fraud, whether or not material, that involved management or other employees who had a significant role in QFOR's internal control over financial reporting.

212.     As a result, Thondavadi and Desai have violated and, unless enjoined, will continue to violate Rule 15d-14 under the Exchange Act.

## ELEVENTH CLAIM FOR RELIEF

**Control Person Liability:**
**Section 20(a) of the Exchange Act**
**(Thondavadi and Desai)**

213.     The Commission repeats and incorporates by reference the allegations in paragraphs 1 through 177 above.

214.     By virtue of the conduct alleged herein, QFOR committed violations of Sections 10(b), 13(b)(2)(A), 13(b)(2)(B), and 15(d) of the Exchange Act [15 U.S.C. §§ 78j(b), 78m(b)(2)(A), 78m(b)(2)(B), 78o(d)] and Rules 10b-5, 12b-20, 15d-1, 15d-11, and 15d-13 thereunder [17 C.F.R. §§ 240.10b-5, 240.12b-20, 240.15d-1, 240.15d-11, 240.15d-13].

215.     As set forth above, during the relevant period, Thondavadi and Desai, directly or indirectly, controlled QFOR.

216.     Pursuant to Section 20(a) of the Exchange Act [15 U.S.C. §§ 78t(a)], Thondavadi and Desai are each liable as a control person for QFOR's violations of Sections 10(b), 13(b)(2)(A), 13(b)(2)(B), and 15(d) of the Exchange Act and Rules 10b-5, 12b-20, 15d-1, 15d-11, and 15d-13 thereunder.

217.     Accordingly, Thondavadi and Desai are liable jointly and severally with and to the same extent as QFOR for QFOR's violations.

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that this Court enter a final

judgment:

A.      Permanently restraining and enjoining QFOR from violating Section 17(a) of the

Securities Act [15 U.S.C. § 77q(a)] and Sections 10(b), 13(b)(2)(A), 13(b)(2)(B), and 15(d) of

the Exchange Act [15 U.S.C. §§ 78j(b), 78m(b)(2)(A), 78m(b)(2)(B), 78o(d)] and Rules 10b-5,

12b-20, 15d-1, 15d-11, and 15d-13 thereunder [17 C.F.R. §§ 240.10b-5, 240.12b-20, 240.15d-1,

240.15d-11, 240.15d-13];

B.      Permanently restraining and enjoining Thondavadi from violating Section 17(a)

of the Securities Act [15 U.S.C. § 77q(a)] and Sections 10(b) and 13(b)(5) of the Exchange Act

[15 U.S.C. §§ 78j(b), 78m(b)(5)] and Rules 10b-5, 13b2-1, 13b2-2, and 15d-14 thereunder [17

C.F.R. §§ 240.10b-5, 240.13b2-1, 240.13b2-2, 240.15d-14]; and from aiding and abetting

violations of Sections 13(b)(2)(A), 13(b)(2)(B), and 15(d) of the Exchange Act [15 U.S.C. §§

78m(b)(2)(A), 78m(b)(2)(B), 78o(d)] and Rules 12b-20, 15d-1, 15d-11, and 15d-13 thereunder

[17 C.F.R. §§ 240.12b-20, 240.15d-1, 240.15d-11, 240.15d-13];

C.      Permanently restraining and enjoining Desai from violating Section 17(a) of the

Securities Act [15 U.S.C. § 77q(a)] and Sections 10(b) and 13(b)(5) of the Exchange Act [15

U.S.C. §§ 78j(b), 78m(b)(5)] and Rules 10b-5, 13b2-1, 13b2-2, and 15d-14 thereunder [17

C.F.R. §§ 240.10b-5, 240.13b2-1, 240.13b2-2, 240.15d-14]; and from aiding and abetting

violations of Sections 13(b)(2)(A), 13(b)(2)(B), and 15(d) of the Exchange Act [15 U.S.C. §§

78m(b)(2)(A), 78m(b)(2)(B), 78o(d)] and Rules 12b-20, 15d-1, 15d-11, and 15d-13 thereunder

[17 C.F.R. §§ 240.12b-20, 240.15d-1, 240.15d-11, 240.15d-13];

D.     Ordering that, as provided in Federal Rule of Civil Procedure 65(d)(2), the injunction(s) entered against each defendant also bind the following who receive actual notice of the injunction(s) by personal service or otherwise:  (a) the defendant's officers, agents, servants, employees, and attorneys; and (b) other persons in active concert or participation with the defendant or with anyone described in (a);

E.     Ordering all defendants to disgorge their ill-gotten gains or unjust enrichment derived from the activities alleged herein, together with prejudgment interest.  In the event a defendant is a debtor in a bankruptcy proceeding, this relief shall be applicable to such defendant to the extent the automatic stay triggered by the bankruptcy proceeding is no longer in effect or has been determined with finality not to apply.  Nothing in this Complaint shall be construed as an act of collection by the Commission against any such defendant;

F.     Ordering all defendants to pay civil monetary penalties under Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act 15 [U.S.C. § 78u(d)(3)].  In the event a defendant is a debtor in a bankruptcy proceeding, this relief shall be applicable to such defendant to the extent the automatic stay triggered by the bankruptcy proceeding is no longer in effect or has been determined with finality not to apply.  Nothing in this Complaint shall be construed as an act of collection by the Commission against any such defendant;

G.     Prohibiting Thondavadi and Desai, under Section 20(e) of the Securities Act [15 U.S.C. § 77t(e)] and Section 21(d)(2) of the Exchange Act [U.S.C. § 78u(d)(2)], from acting as an officer or director of any issuer that has a class of securities registered under Section 12 of the Exchange Act [15 U.S.C. § 78l] or that is required to file reports under Section 15(d) of the Exchange Act [15 U.S.C. § 78o(d)];

56

H.       Retaining jurisdiction of this action in accordance with the principles of equity

and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all

orders and decrees that may be entered or to entertain any suitable application or motion for

additional relief within the jurisdiction of this Court; and

I.       Awarding such other and further relief as the Court deems just and proper.

## JURY DEMAND

The Commission requests a trial by jury.

Respectfully submitted,

**SECURITIES AND EXCHANGE COMMISSION**

By its attorneys,

s/ Meredith J. Laval
Michael D. Foster (Ill. Bar No. 6257063)
John Birkenheier (Ill. Bar No. 6270993)
Robin Andrews (Ill. Bar No. 6285644)
Meredith J. Laval (Ill. Bar No. 6294356)
175 W. Jackson Blvd., Suite 1450
Chicago, IL 60604
Telephone: (312) 353-7390
Facsimile: (312) 353-7398

Dated:  June 29, 2017